IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

BROOKSHIRE GROCERY COMPANY                                                   PLAINTIFF/
                                                                    COUNTER DEFENDANT

v.                                            Case No. 1:24-cv-01067

LINDSEY-PINE PLAZA, LLC.                                                    DEFENDANT/
                                                                    COUNTER PLAINTIFF

**MEMORANDUM OPINION**

Before the Court is a Motion for Summary Judgment filed by Plaintiff and Counter Defendant Brookshire Grocery Company ("Brookshire"). (ECF No. 23). Defendant and Counter Plaintiff Lindsey-Pine Plaza, LLC, ("Lindsey-Pine") has filed a response. (ECF No. 28). Brookshire has filed a reply. (ECF No. 31). The Court finds the matter ripe for consideration.

**I.     BACKGROUND**

This case concerns a dispute about the meaning of a lease for a Brookshire grocery store in the Pine Plaza shopping mall in Arkadelphia, Arkansas. The leased facility required extensive repairs. Now, Brookshire, the lessee, and Lindsey-Pine, the lessor, disagree on who holds the obligation to pay for those repairs. The relevant facts are as follows.

The Original Lease was executed in 1972 between Doyle and Josephine Rogers, the original owners of the shopping center, and Safeway Stores, Inc. (ECF No. 23-6). The Original Lease contained paragraphs 7 and 8, which carried over unchanged through multiple amendments into the current lease, and which are at the center of the parties' dispute. Paragraph 7 obligates the lessor to maintain and repair structural damage to the leased premises. It states, in relevant part:

> Lessor's repairs. *Lessor agrees to keep the building structure on the leased premises (including, without limitation,* the roof, roof structures and supports, *foundation and structural supports*, walls, *structural portion of the floors*, chimneys, skylights, gutters, downspouts and exterior doors) . . . *in good*

> *repair* during the lease term . . . . If lessee is deprived of the use of a substantial portion of the leased premises during the making of any repairs, improvements or alterations by lessor under any provision of this lease, the rent shall be abated or proportionally reduced according to the extent which lessee is deprived of such use.

(ECF No. 23-6, at ¶ 7) (emphasis added).

Paragraph 8 of the Original Lease obligates the lessee "to repair all damage to the leased premises caused by lessee's use *other than ordinary wear and tear and the matters covered in paragraph 7* . . . ." (ECF No. 23-6, at ¶ 8) (emphasis added). Again, both the obligations set out in paragraphs 7 and 8 of the Original Lease have been incorporated unchanged into the subsequent amended leases.

In 1973, the Lease was amended to change the start and end dates ("Lease Amendment"). (ECF No. 23-7). In 1984, the Lease was amended to contemplate an expansion ("First Lease Modification"). (ECF No. 23-8). In 1987, Safeway sold its stores to Acadia Stores 61, which operates as Harvest Foods. Safeway assigned its interest in the Original Lease, as amended, to Acadia Stores. In 1988, Acadia Stores (operating as "Harvest Foods") and the Rogers executed another lease modification, the "Second Lease Modification," which envisioned the relocation of Harvest Foods to a different section of the shopping center. The Second Lease Modification required the lessee "at its sole expense" to remodel the new location "for its exclusive use" in accordance with plans that were subject to the Rogers' approval. (ECF No. 23-9, at ¶ 3.1). If the Rogers failed to object to the plans within twenty days, the Second Lease Modification provided that "it shall be conclusively presumed that said plans . . . are approved on Lessor's part." (ECF No. 23-9, at ¶ 3.2(c)). Harvest Foods produced the remodel plans and no evidence indicates that the Rogers objected. After the remodel and relocation by Harvest Food was completed, Harvest Food and the Rogers entered another amended lease ("Third Lease Modification"), which

2

memorialized the new location. (ECF No. 23-10). Importantly, all other terms of the Lease, including the repair obligations of Paragraphs 7 and 8, remained unchanged.

In 1994, Lindsey-Pine purchased the store property from the Rogers. (ECF No. 23-12, at 31). Following the bankruptcy of Harvest Foods in 1997, Brookshire purchased some of its assets and assumed the at-issue Lease. (ECF No. 23-13). Under the Instrument of Assignment and Assumption ("Assignment and Assumption"), Brookshire agreed to "assume the obligations and liabilities under the [Lease] arising from and after the Closing Date." (ECF No. 23-13, at 1). Brookshire also agreed "to pay and discharge and perform and observe all the terms, covenants and conditions of the Assumed Liabilities." (ECF No. 23-13, at 1). On June 18, 2021, Brookshire and Lindsey-Pine, the current lessee and lessor, entered the Fourth Lease Modification, which incorporated the terms of the Original Lease and lease modifications. (ECF No. 23-14). The Fourth Lease Modification is the current lease.

For clarity, the timeline of the lease modifications is as follows:

- Original Lease Agreement (1972)
- Lease Modification Agreement (1973) – amends the start and end dates.
- First Lease Modification (1984) – expands the leased premises.
- Second Lease Modification (1988) – envisions a relocation and remodel at the Lessee's (Harvest Food) expense.
- Third Lease Modification (1989) – memorializes the relocation.
- Fourth Lease Modification (2021) – affirms Lindsey-Pine as successor-in-interest to the Rogers and Brookshire as successor-in-interest to Harvest Food.

In July 2021, Brookshire was informed that the concrete floor and steel supports beneath the Loading/Storage Room and Market Prep Area of the leased property were failing and at risk of

3

collapse. (ECF No. 23-15). Under both the Loading/Storage Room and the Market Prep Area lie the Basement and Crawlspace. The Basement contains structural steel columns and beams that support the concrete slab floor between the Basement and the Loading/Storage Room. The Crawlspace contains steel galvanized decking and 18-inch bar joists that support the concrete flooring of the Loading/Storage Room and Market Prep Area above. (ECF No. 25, at 1-3).

The damage to the leased property included severe cracks and holes in the concrete flooring of the Loading/Storage Room and corrosion of the steel supports in the Basement and Crawlspace. (ECF Nos. 23-24; 28-17, at 11-14). Brookshire characterizes the damage and subsequent repairs as structural in nature. Brookshire argues that Lindsey-Pine itself and Lindsey-Pine's own structural expert agree that the cement floor, steel supports, and subsequent repairs were structural. (ECF Nos. 23-12, at 54; 23-13, at 62-63).

Lindsey-Pine does not argue that the steel supports, damages, and repairs were not structural. Rather, Lindsey-Pine argues that Brookshire's characterization of the supports, damages, and repairs as structural overlooks the fact that the damage was caused by Brookshire's use, which Lindsey-Pine characterizes as "*exceeding* ordinary wear and tear" or "extraordinary use." (ECF No. 29, at 5-9).

Specifically, Lindsey-Pine argues that Brookshire caused the damage by using forklifts with a weight and lift capacity that far exceed the load that the concrete floors could handle. (ECF No. 29, at 6). Lindsey-Pine also argues that Brookshire installed a 10,000 lb. freezer, which caused stress to the Loading/Storage Room floor and "created a highly corrosive environment" due to the extreme heat produced by its electrical motors. (ECF No. 29, at 6). Further, Lindsey-Pine argues that Brookshire's extensive "wash down" procedure of the Market Prep Area, as well as the heat from the freezer, caused the steel supports to corrode. (ECF No. 29, at 8-9).

After learning of the damage to the concrete floor and steel supports, Brookshire retained a structural engineer to draw plans for the repair. (ECF Nos. 23-5; 23-16). In August 2021, temporary support beams were installed under the Market Prep Area. Brookshire paid $21,546.80 to install the temporary supports and $197,581.23 to install the permanent structural steel work. (ECF No. 23-17).

In December 2021, Brookshire and Lindsey-Pine agreed on a plan for the permanent repair of the floor system of the Basement and Crawlspace. After Lindsey-Pine refused to pay for the repairs, Brookshire paid for the fabrication and installation of structural supports in the Basement and Crawlspace. (ECF Nos. 25, at 7-8; 30). Brookshire and Lindsey-Pine also agreed to repair the cracks and holes in the concrete floor. The repair consisted of filling the cracks and holes with epoxy resin and then installing a "fiber plate," which distributes load and maintains the structural strength of the floor, over the repaired-concrete floor. (ECF Nos. 25, at 8-9; 30). Lindsey-Pine paid $345,724.27 for the costs of repairing the floor and installing the fiber plate. (ECF No. 25, at 9).

On September 30, 2024, Brookshire filed its Complaint in this case. (ECF No. 2). In its Complaint, Brookshire asserts breach of contract, unjust enrichment, and negligence claims against Lindsey-Pine. On November 5, 2024, Lindsey-Pine filed its Answer and Counterclaim against Brookshire. (ECF No. 10). Lindsey-Pine denies that it is responsible for the repairs paid for by Brookshire and asserts that Brookshire is responsible for the repairs to the concrete floor paid by Lindsey-Pine.

On September 9, 2025, Brookshire filed the instant Motion for Summary Judgment.[1] (ECF

---

[1] The Court notes that Brookshire moves the Court to enter summary judgment in its favor on its breach of contract claim and to dismiss Lindsey-Pine's counterclaim with prejudice. (ECF No. 23, at 3). Neither Brookshire nor Lindsey-Pine address the elements (or defenses) of Brookshire's breach of contract claim, or its related claims for

5

No. 23). Brookshire argues that Lindsey-Pine is required to pay for all repairs because the repairs were entirely structural, and the parties' Lease obligates the lessor to pay for structural repairs. (ECF No. 24, at 9-11). Brookshire also argues that it is not responsible for any liabilities arising from Harvest Food's remodel of the facility under the Assignment and Assumption. (ECF No. 24, at 15). Lindsey-Pine filed its Response on September 30, 2025. (ECF No. 28). In its Response, Lindsey-Pine argues that it is not responsible for the repairs because paragraph 8 of the Lease only requires the lessor to pay for damages caused by "ordinary wear and tear" and Brookshire's use exceeded "ordinary wear and tear." (ECF No. 29, at 10). Lindsey-Pine contends that summary judgment is not warranted because whether Brookshire's use of the premises exceeded "ordinary wear and tear" pursuant to the Lease is a genuine issue of material fact. Lindsey-Pine also argues that the Assignment and Assumption and the Lease contractually obligated Brookshire to retrofit the facility for its intended use. (ECF No. 29, at 12). On October 6, 2025, Brookshire filed its Reply. (ECF No. 31). In its Reply, Brookshire argues that Lindsey-Pine admits that all repairs are structural, that reading paragraphs 7 and 8 of the Lease together requires the lessor to make structural repairs, and that the Assignment and Assumption expressly limited Brookshire's liability to the date Brookshire purchased Harvest Foods' assets.

## II.    STANDARD OF REVIEW

The standard for summary judgment is well established. When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual

---

unjust enrichment and negligence, in their briefs. Rather, the parties solely argue the issue of liability, asking the Court to interpret their Lease. This is what the Court has done.

issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution affects the outcome of the case. *Id*. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving part's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007).

### III. DISCUSSION

The parties' dispute centers on a disagreement over the interpretation of two parts of their Lease. First, the parties disagree on the meaning of paragraphs 7 and 8 of their Lease. Second, the parties disagree on the consequence of the Assignment and Assumption and the 1988 Second Lease Modification. The Court will take each in turn.

### A. Paragraphs 7 and 8 of the Lease

To resolve the parties' disagreement over the meaning of their Lease, the Court must first determine whether the Lease is ambiguous. "When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine." *Roberts Contracting Co., Inc. v. Valentine-Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 8-9, 320 S.W.3d 1, 10 (2009) (citations omitted). "The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve." *Id.* "Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation." *Id.* (citations omitted). If the Court finds the contract ambiguous, it may interpret the "ambiguous contract as a matter of law when the ambiguity can be resolved by reference to the contract language itself." *Roetzel v. Coleman*, 210 Ark. App. 206, 7, 374 S.W.3d 166, 171 (2010). However, if the Court finds the contract ambiguous "as to the intent of the parties, and the meaning of the language depends on disputed extrinsic evidence, the issue is a question of fact for the jury." *Id.* (citing *Perry v. Baptist Health*, 358 Ark. 238, 189 S.W.3d 54 (2004)).

In interpreting a contract, the Court must apply the "three well-established principles of [Arkansas] contract law." *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992). First, the Court should give the contract the meaning that the parties intended. *Id.* Second, the Court must give the words of the contract "their plain [and] ordinary meaning." *Id.*; *see also Missouri Pac. R. co. v. Strohacker*, 202 Ark. 645, 152 S.W.2d 557, 563 (1941) (directing courts to construe contracts by their plain terms as it would be construed by the parties themselves and the "mass of mankind"). Third, the Court must read together the different clauses of a contract and construe the contract "so that all of its parts harmonize, if that is at all possible." *First Nat'l Bank of Crossett*, 310 Ark. at 169-70, 832 S.W.2d at 819 (quoting *Continental Casualty*

*Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971)). "A construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions." *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 686 (2004).

The parties assert two different readings of paragraphs 7 and 8 of their Lease. Brookshire argues that the Lease obligates the lessor (Lindsey-Pine) to keep the building structure in good repair and to repair all structural damages. (ECF No. 24, at 10). Brookshire's reading of the Lease incorporates both paragraphs 7 and 8. Paragraph 8 requires the lessee (Brookshire) to repair all damage caused by the lessee's use "other than ordinary wear and tear <u>and the matters covered in paragraph 7</u>." (ECF No. 23-6, at ¶ 8) (emphasis added). Paragraph 7 states that the lessor must "keep the building structure . . . in good repair." (ECF No. 23-6, at ¶ 7). The building structure includes, "without limitation," the "foundation and structural supports" and the "structural portion of the floors." (ECF No. 23-6, at ¶ 7). Thus, Brookshire argues that, read together, paragraphs 7 and 8 assign all structural repairs to the lessor. Since the repairs made were structural, as admitted by Lindsey-Pine and its expert, Brookshire argues that the duty to pay for those repairs falls on Lindsey-Pine.

Lindsey-Pine argues that Brookshire's interpretation reads paragraph 7 in isolation of and disharmony with paragraph 8. Lindsey-Pine argues that paragraph 8 expressly provides that the lessee must repair all damage to the leased premises in excess of "ordinary wear and tear." (ECF No. 29, at 11). Brookshire's interpretation, Lindsey-Pine argues, disharmonizes the two paragraphs because it would neutralize the "ordinary wear and tear" provision of paragraph 8, rendering it superfluous. (ECF No. 29, at 11). Lindsey-Pine contends that Brookshire's use exceeded "ordinary wear and tear," and thus a clear reading of paragraph 8 requires the lessee to pay for the damages.

9

Neither party argues that the Lease terms are ambiguous. Rather, both parties ask the Court to adopt their interpretation of the Lease. The Court finds that any ambiguity can be resolved with a plain reading of the contract. *See Zulpo v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.*, 98 Ark. App. 320, 324, 255 S.W.3d 494, 498 (2007) ("[W]here the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law.").

The Court finds that the contract, read together, requires the lessor to pay for *both* damage caused by ordinary wear and tear *and* structural repairs. Lindsey-Pine's interpretation of paragraph 8 asks the Court to stop reading after "ordinary wear and tear." However, paragraph 8 goes on to exempt the lessee from paying for any structural repairs by incorporating by reference paragraph 7. To read otherwise would fail to read the plain language of the Lease or to consider the Lease as a whole. *See Fowler v. Unionaid Life Ins. Co.*, 180 Ark. 140, 144-45, 20 S.W.2d 611, 612 (1929) ("The contract must be viewed from the beginning to end, and all its terms must pass in review, for one clause may modify, limit or illuminate the other.").

The Court does not agree with Lindsey-Pine's assertion that reading paragraph 8 as written, to include "other than ordinary wear and tear <u>and</u> the matters covered in paragraph 7" disharmonizes the two paragraphs and renders the phrase "other than ordinary wear and tear" superfluous. The Lease clearly states that the lessee is exempt from the duty to pay for both damage caused by ordinary wear and tear and structural repairs. If, as Lindsey-Pine asserts, the structural disrepair was caused by Brookshire's use exceeding that of ordinary wear and tear, paragraph 8 still envisions any structural repairs to be made by the lessor through its reference to paragraph 7. Further, an interpretation of the Lease which omits "and the matters covered in paragraph 7" from paragraph 8 would render that phrase superfluous.

Accordingly, the Court holds that the Lease obligates the lessor, Lindsey-Pine, to pay for structural upkeep and repairs of the leased premises.

### B. Second Lease Modification and Assignment and Assumption

The parties also disagree on Brookshire's obligations under the Assignment and Assumption and the Second Lease Modification.

Following Harvest Food's bankruptcy, Brookshire purchased Harvest Food's "right, title and interest" in the Original Lease. The Assignment and Assumption obligates Brookshire "to pay and discharge and perform and observe all the terms, covenants, and conditions" of the Lease, which incorporates all lease modifications. (ECF No. 23-13, at 1). Accordingly, Lindsey-Pine argues that Brookshire assumed the obligation through the Assignment and Assumption to remodel the leased facility for its exclusive use pursuant to paragraph 3.1 of the Second Lease Modification. *See Pemberton v. Arkansas State Highway Commission*, 268 Ark. 929, 933, 596 S.W.2d 605, 608 (1980) ("An assignment . . . is essentially a delegation of the performance of the duties of an assignor to another who, by its acceptance, promises to perform those duties."). Paragraph 3.1 of the Second Lease Modification states that the lessee "at its sole expense shall remodel the Relocation Area for its exclusive use . . . ." (ECF No. 28-4, at ¶ 3.1). In other words, according to Lindsey-Pine, Brookshire should have remodeled the facility to withstand its heavy forklifts, freezer, and intense "wash down" procedures that led to the deterioration of the floor and support structures.[2]

Brookshire argues that the Assignment and Assumption limited the obligations and liabilities that it assumed when it purchased the assets of Harvest Food. Brookshire points to a

---

[2] Lindsey-Pine also argues that Brookshire was contractually obligated under the Assignment and Assumption to honor the Original Lease, which requires the lessee repair all damages it caused in excess of "ordinary wear and tear." (ECF No. 29, at 13). Lindsey-Pine's argument, however, is based on its reading of paragraphs 7 and 8 of the Original Lease, which the Court has rejected in its analysis above.

11

"Whereas clause" in the Assignment and Assumption in which it only "agreed to assume the obligations and liabilities under the [Lease] *arising from and after the Closing Date.*" (ECF No. 23-13, 1). The closing date was March 10, 1997. (ECF No. 23-13). Thus, Brookshire contends that any liabilities from before its purchase remain with Harvest Food. Brookshire also contends that the Second Lease Modification did not shift responsibility of structural repairs or integrity from the lessor to the lessee. (ECF No. 24, at 16). Rather, the Second Lease Modification only required that Harvest Food remodel the leased premises to which it relocated.

To determine the intent of the drafters from the whole context of the Lease, the Court will consider the Second Lease Modification and the Third Lease Modification together.[3] *See First Nat'l Bank of Crossett*, 310 Ark at 170, 832 S.W.2d at 819-20; *see also Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1213 (8th Cir. 2012) (noting that Arkansas law requires courts to construe a lease agreement and its corresponding drafts together as a single contract).

The Second Lease Modification was drafted because the lessee at the time, Harvest Food, planned to relocate its grocery store to a new area of the lessor's shopping center ("Relocation Area"), which was previously used as a department store. Thus, in the Second Lease Modification, Harvest Food and the lessor agreed that Harvest Food would remodel the Relocation Area for its exclusive use as a grocery store. (ECF No. 23-9). The Second Lease Modification also states that "[u]pon Lessee's opening for business in the Relocation Area, Lessee shall surrender the Current Leased Premises" and "the parties shall … execute a Lease Modification Agreement incorporating the Relocation Area as the new leased premises." (ECF No. 23-9, at ¶ 3.1). Pursuant to the Second Lease Modification, after Harvest Food remodeled and relocated to the Relocation Area, it entered the Third Lease Modification with the lessor. The Third Lease Modification then incorporated the

---

[3] The 2021 Fourth Lease Modification incorporated the terms of the Original Lease and subsequent modifications leaving the obligations of Lindsey-Pine and Brookshire, as assignees to the Lease, unmodified.

Relocation Area as the new leased premises. (ECF No. 23-10, at ¶ 3.2).

Accordingly, the Court finds that the drafters of the Second Lease Modification intended the requirements of paragraph 3.1 to apply to Harvest Food's specific move to and remodel of the Relocation Area. *See First Nat'l Bank of Crossett*, 310 Ark at 170, 832 S.W.2d at 819 ("It is a well settled rule in construing a contract that the intention of the parties is to be gathered . . . from the whole context of the agreement."). Said otherwise, the Court finds that the Second Lease Modification does not obligate Brookshire to remodel the Relocation Area or perform structural repairs. *See Kraft v. Limestone Partners, LLC*, 2017 Ark. App. 315, 8, 522 S.W.3d 150, 155 (2017) ("[Courts] will not read into the contract words that are not there, and we will not rewrite a contract or approve additional terms that would, in effect, enforce a contract that the parties might have made, but did not make.").

In sum, the Court holds that the Lease, read together as a whole, does not shift the liability for structural repairs to the lessee. Thus, the Court finds that Lindsey-Pine is liable for structural repairs. Finally, the Court finds it unnecessary to address Brookshire's counterargument that the Assignment and Assumption limits its liability for Harvest Food's actions to the closing date because liability for structural repairs in the Lease remains with the lessor.

## IV.   CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Brookshire Grocery Company's Motion for Summary Judgment on Liability (ECF No. 23) should be and hereby is **GRANTED**.

**IT IS SO ORDERED**, this 10th day of November, 2025.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge